No. 52,359

In the Matter of the Estate of Owen C. Loughmiller, Deceased.

(629 P 2d 156)

Opinion filed June 10, 1981.

*Richard L. Helms,* of Jones & Dearth, Chartered, of Parsons, argued the cause and was on the brief for the appellant.

*E. Richard Brewster,* of Gehrt & Roberts, Chartered, of Topeka, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

HERD, J.: Sam L. Loughmiller, Jr., executor of the estate of Owen C. Loughmiller, deceased, appeals from a trial court decision holding Peggy L. Loughmiller was legally married to the deceased and that the property settlement agreement between Peggy and Owen was not a valid consent to the will and failed as a post-nuptial agreement.

The facts are undisputed. Owen C. Loughmiller and Peggy L. Loughmiller were first cousins and were married August 30, 1973, in Lamar, Colorado, in a Methodist church by a Methodist minister, in accordance with the laws of Colorado. At the time of the marriage, Owen was a resident of Kansas and Peggy was a resident of Oklahoma. The couple established their home in

Parsons, Kansas, after the marriage. The Loughmillers later experienced marital difficulties and in contemplation of divorce, they entered into a separation and property settlement agreement on January 25, 1979. On March 13, 1979, Owen executed a will which omitted any mention of Peggy. On April 18, 1979, he filed a petition for divorce from Peggy. The divorce action was interrupted by Owen's death on May 10, 1979.

Loughmiller's will was admitted to probate in Labette County on June 12, 1979, and on November 17, 1979, Peggy filed an election to take one-half the decedent's estate by intestate succession as surviving spouse. The court held an evidentiary hearing and found although marriages between first cousins are void if contracted in Kansas (K.S.A. 23-102), such marriages validly contracted outside Kansas must be held valid in Kansas pursuant to K.S.A. 23-115 where there is no evidence such marriages are odious to the public policy of Kansas. The court also held the separation agreement was invalid as to consent to the will because it was not executed pursuant to K.S.A. 59-602. In addition, the court held since the parties had not been divorced and a trial court had not approved the agreement, it failed as a post-nuptial separation and property settlement agreement. Therefore, as the surviving widow of Owen Loughmiller, Peggy Loughmiller's request to take according to the laws of intestate succession was upheld. This appeal followed.

Appellant initially questions the legality of the Loughmillers' marriage. Was the first cousin marriage valid and legally recognizable in Kansas? The statutes which must be reconciled are K.S.A. 23-102 and 23-115, which provide:

23-102

"All marriages between parents and children, including grandparents and grandchildren of any degree, between brothers and sisters of the one half as well as the whole blood, and between uncles and nieces, aunts and nephews, and first cousins, are declared to be incestuous and absolutely void. This section shall extend to illegitimate as well as legitimate children and relations."

23-115

"All marriages contracted without this state, which would be valid by the laws of the country in which the same were contracted, shall be valid in all courts and places in this state."

Obviously, if the Loughmillers' marriage had been celebrated in Kansas, it would be void, pursuant to K.S.A. 23-102.

The general rule with regard to the recognition of marriages solemnized elsewhere is that if the marriage is valid where contracted, it is valid everywhere. The exceptions to that rule are (1) polygamous marriages and marriages incestuous according to the principles of Christendom and (2) marriages prohibited by the forum state for public policy reasons. Annot., 117 A.L.R. 186.

There are three reasons for prohibiting incestuous marriages: (1) they are forbidden by ecclesiastical law (see Old Testament, *Leviticus* 18: 6-18); (2) inbreeding is thought to cause a weakening of the racial and physical quality of the population according to the science of eugenics; (3) they prevent the sociological consequences of competition for sexual companionship among family members. 52 Am. Jur. 2d, Marriages § 62, p. 915.

First cousin marriages were not prohibited at common law (52 Am. Jur. 2d, Marriages § 63, p. 916) and such marriages were not Biblically prohibited. Moreover, there are opposing views regarding the effects of inbreeding from first cousin marriages. See Storke, *The Incestuous Marriage - Relic of the Past,* 36 U. of Colo. L. Rev. 473, 477 (1964); Moore, *A Defense of First-Cousin Marriage,* 10 Cleveland Marshall L. Rev. 136 (1961); Foster, *Marriage: A "Basic Civil Right of Man,"* 37 Fordham L. Rev. 51, 62 (1968). See generally Nagan, *Conflict of Laws and Proximate Relations: A Policy-Science Perspective,* 8 Rutgers Camden L. J. 416, 442-443 (1977); Drinan, *The Loving Decision and the Freedom to Marry,* 29 Ohio St. L. J. 358 (1968).

Our research reveals we are without direct precedent in Kansas on this question. Before tackling the few Kansas cases which touch upon this issue, we will detail a few decisions from other jurisdictions to illustrate reasons advanced by forum states in considering whether to uphold or nullify a marriage between first cousins.

Cases following the general rule in first cousin marriages are *Mazzolini v. Mazzolini,* 168 Ohio St. 357, 155 N.E.2d 206 (1958); *In re Miller's Estate,* 239 Mich. 455, 214 N.W. 428 (1927); and *Garcia v. Garcia,* 25 S.D. 645, 127 N.W. 586 (1910). In *Mazzolini,* the court followed the general rule because the Ohio statute merely prohibited such marriages; it did not expressly state such a marriage would be void. In *Miller,* and in *Garcia,* the courts noted the lack of legislative intent to void marriages valid in other states but void in the forum state. The court in *Garcia* also noted

the nullification of marriages solemnized in other forums would have disastrous results to the rights of inheritance and the legitimization of children. Finally, the court in *Garcia* noted first cousin marriages were not incestuous according to Biblical law.

The following cases followed the exception to the general rule in considering first cousin marriages and found such marriages violate strong public policy. *In re Mortenson's Estate,* 83 Ariz. 87, 316 P.2d 1106 (1957); *Meisenhelder v. Chicago & N. W. Ry. Co.,* 170 Minn. 317, 213 N.W. 32 (1927); *Johnson v. Johnson,* 57 Wash. 89, 106 Pac. 500 (1910). In the *Mortenson* case, the Arizona statute stated marriages valid where solemnized would be valid in Arizona. However, the statute went on to expressly prohibit an Arizona domiciliary from evading Arizona law by leaving the state to enter into a marriage that would not be valid if celebrated in Arizona where the parties intended to return to Arizona to live. The court held the statute prohibiting evasion of Arizona laws showed a marriage solemnized in another state under the stated conditions would have the same effect as if it had been solemnized in Arizona. In *Meisenhelder,* first cousins who were residents of Illinois were married in Kentucky. The husband was killed in Illinois in an industrial accident and the widow attempted to recover for his death under the Employer's Liability Act. The court found the marriage null and void pursuant to the Uniform Marriage Evasion Act which provided if residents of Illinois who intended to reside in Illinois went to another state and contracted a marriage prohibited by Illinois law, the marriage would be null and void for all purposes. In the *Johnson* case, the Washington statute declared such marriages incestuous and entering into them was punishable by criminal penalties. The court interpreted those statutes to imply that evasion of Washington law was prohibited although there was no statute expressly prohibiting evasion of Washington law. The court made a passing reference to the repugnance of such marriages by noting that the couple's only child was deaf and mute.

We refer the reader to Annot., 117 A.L.R. 186 for additional cases dealing with recognition of a foreign marriage where such marriage is questioned by the forum state.

In Kansas, the case of *Westerman v. Westerman,* 121 Kan. 501, 247 Pac. 863 (1926), contains a discussion of K.S.A. 23-115. In that case, Bertha Westerman, formerly married to William Rice,

was granted a divorce from Rice in Kansas. The divorce statute in effect at that time stated both parties to the divorce were prohibited from remarrying within six months from the date of the divorce decree. Nine days after the decree was entered, Bertha was married in Missouri to Henry Westerman. The parties thereafter lived in Kansas. A few months later, Bertha filed a petition in a Kansas court to annul the marriage. A district court found the marriage null and void. Henry Westerman died two years later. In 1925, Bertha filed a motion to vacate the decree of annulment. A trial court denied the motion and she appealed to the Supreme Court, claiming she had not brought the prior annulment action and had not authorized anyone to bring it for her. She claimed she had no knowledge of the proceedings until three years after the decree was entered. Finally, Bertha claimed the Kansas court was without jurisdiction to annul a marriage solemnized in Missouri. This court found Bertha's assertions to be patently false and upheld the trial court's denial of the motion to vacate the annulment. Within that case is the following discussion of K.S.A. 23-115:

"Section 23-115, relating to validity here of marriages lawfully contracted in another country, is open to judicial interpretation. The statute was enacted in 1867, and was an aid to colonization of foreign immigrants in the new state. It is conceivable the word 'country' might not have been intended to apply to other states of the American Union, even although in pioneer days it was not considered good form to inquire too searchingly into the antecedents of new settlers. However that may be, the word country did apply to foreign countries. Suppose a man from a country permitting polygamy were to bring his group of wives, or a woman from a country permitting polyandry were to bring her group of husbands, and were to undertake to enjoy here the marital relations lawful in the country of origin. It is conceivable the statute would be interpreted according to the common conscience of the people of this country, and the man or woman would be restricted to a single spouse. *It is also conceivable an incestuous marriage relationship would not be tolerated at all, even though valid where contracted.* Considerations such as these have led to recognization of exceptions to the common-law rule that a marriage valid where contracted will be regarded as valid elsewhere. Such an exception exists whenever the legislature has clearly declared that a certain kind of marriage—as a marriage contracted in evasion of its laws—shall be deemed invalid, and generally, whenever a marriage contracted in another state or country is odious to the public policy of the state in which its validity is challenged, it will not be recognized as valid." (Emphasis added.) *Westerman*, 121 Kan. at 504-05.

Before turning to the main question before us, we note appellant contends the word "country" in K.S.A. 23-115 should be

construed to refer to only marriages contracted outside the United States. Appellant relies on the above quoted material from *Westerman* which noted when the statute was enacted, the legislature may have intended such a result. Although K.S.A. 23-115 may have been enacted as an aid to colonization of settlers from foreign countries, limiting the statute to that interpretation is not logical in today's society. It would be incongruous to recognize a marriage celebrated in India, while refusing to recognize the same marriage solemnized in Missouri. We hold K.S.A. 23-115 refers to marriages celebrated in other states as well as countries. See *In re Takahashi's Estate,* 113 Mont. 490, 129 P.2d 217 (1942).

One further consideration regarding the validity of this marriage is whether *Westerman* prohibits the marriage on the basis of evasion of the laws of Kansas. We turn our attention to the following passage:

"The statute making it unlawful for either party to a divorce decree to marry within six months, declaring such marriage to be 'absolutely void,' and punishing the party contracting such marriage as guilty of bigamy, was enacted in 1889. [Citation omitted.] To permit a divorcee to hasten to Kansas City, or Omaha, or Denver, or Oklahoma City, marry there, and then return to Kansas as lawfully wedded, is not consonant with the spirit of the statute, and it is conceivable the legislature intended such a marriage should be absolutely void, even although it did not in express terms declare that a marriage contracted in evasion of the laws of this state shall not be given effect. *Westerman* at 505.

The court hastened to add the following: "This court has not heretofore expressed, and is not now expressing, any opinion on the subject." *Westerman* at 505. The foregoing observation by the court was dicta and was not necessary to the decision. The actual validity of the marriage was not before the court. The sole issue was whether Bertha Westerman had or had not brought an annulment action against her deceased husband, thereby voiding their marriage. The court found she clearly participated in the annulment action, she did not appeal from the decision and she was bound by the court's decree.

Although the court's language regarding evasion of Kansas law was couched in speculative terms and was unnecessary to the holding of the case, it was quoted and became the basis for another case which questioned the validity of a marriage contracted outside Kansas. *Peters v. Peters,* 177 Kan. 100, 276 P.2d 302 (1954), involved the proper distribution of benefits to be awarded under a worker's compensation claim. The court was

asked to uphold a Missouri marriage contracted by two Kansas domiciliaries only three months after the legal Kansas divorce of one of the parties to the marriage. The court relied on the statement in *Westerman* regarding evasion of Kansas law and held the marriage void.

We do not regard those statements from *Westerman* and *Peters* as persuasive in this case. The discussion was not directly applicable to *Westerman* and in *Peters,* the court clearly limited its application to the statute prohibiting remarriages within a six-month waiting period following a prior divorce by one of the parties, stating it was an "indication of its view respecting the force and effect to be given such statute [G.S. 1949, 60-1512]   .   .   .   ." *Peters* at 107.

Finally, appellant relies on additional dicta from *Westerman* regarding incestuous marriages to strengthen his contention that this court will not uphold a marriage which is incestuous under the laws of Kansas but which is valid where celebrated. Although our statutes prohibit first cousin marriages and impose criminal penalties where such marriages are contracted in Kansas, we cannot find that a first cousin marriage validly contracted elsewhere is odious to the public policy of this state. The reason for the inclusion of first cousins in K.S.A. 23-102 has become less compelling in recent years as evidenced by the legislature's omission of sexual intercourse between first cousins in the definition of incest. K.S.A. 21-3602 - 3603, amending K.S.A. 21-906 (Corrick). In addition, comparing the cited cases in which such marriages were voided by the forum state, we find each of the cases distinguishable from our laws. Kansas does not have a statute specifically controlling the marriages of its residents celebrated outside the state like that discussed in *In re Mortenson's Estate,* 83 Ariz. 87, nor has the legislature enacted the Uniform Marriage Evasion Act, discussed in *Meisenhelder,* 170 Minn. 317. Finally, we do not find precedent for voiding the marriage as an evasion of Kansas law, as the Washington court held in *Johnson,* 57 Wash. 89. We find the marriage between Peggy and Owen Loughmiller valid.

The final issue is whether the trial court erred in finding the property settlement agreement was not a valid and enforceable post-nuptial agreement. Owen and Peggy Loughmiller were not divorced and Peggy was excluded from Owen's will without

having executed a consent to the will pursuant to K.S.A. 59-602(2). The question presented is whether Peggy is bound by the separation and property settlement agreement or, as the surviving widow, whether she may elect to inherit under the laws of intestate succession. K.S.A. 59-603.

An examination of the agreement and the language used by the parties reveals it was clearly executed in contemplation of divorce. The terms of the agreement show the parties agreed to accept the separate property "in full satisfaction of any and all their rights and interest in or to the property and assets of their said marriage and of each other  . . . ." The agreement stated it was the intention of the parties to fully release each other and their respective property from claims against property acquired in the future. The parties also agreed to "waive any and all rights to the estate of the other left at his or her death, and  . . . renounce and waive all right to inherit under any Will of the other  . . . ." The agreement recited that each party had sought the advice of independent counsel.

Appellee argues since the agreement was entered into in contemplation of divorce, it is not binding until a trial court finds it valid and until the agreement is incorporated into the divorce decree, pursuant to K.S.A. 1980 Supp. 60-1610(e). She also cites Supreme Court Rule 164 (225 Kan. lxxi) which requires certain factual statements be made to the trial court in order to determine the equity of the separation agreement. Mrs. Loughmiller relies on *In re Estate of Sweeney,* 210 Kan. 216, 500 P.2d 56 (1972), to support her position. The facts of *Sweeney* are distinguishable from the facts at hand, but *Sweeney* does contain a long discussion of a trial court's duty to confirm and ratify a separation agreement prior to its becoming valid. That requirement is discussed in greater specificity in *Spaulding v. Spaulding,* 221 Kan. 574, 561 P.2d 420 (1977), and *Lewis v. Lewis,* 4 Kan. App. 2d 165, 603 P.2d 650 (1979).

This case is similar to *King v. Mollohan,* 61 Kan. 683, 60 Pac. 731 (1900), in which we held a widower could not inherit from the estate of his late wife where the couple had entered into a separation agreement renouncing all claims to the other's estate. The agreement was made in contemplation of a divorce but the divorce was never filed. See *Hewett v. Gott,* 132 Kan. 168, 294 Pac. 897 (1931). See generally Vernon's Kansas Probate Code

§ 59-602, p. 232 (1978). We also note that it is well established that post-nuptial agreements, fairly and understandingly made, settling property rights between husband and wife are binding whether or not an action for divorce is instituted. Such agreements are not against public policy and are enforceable. *Hoch v. Hoch,* 187 Kan. 730, 731, 359 P.2d 839 (1961); *Perkins v. Perkins,* 154 Kan. 73, Syl. ¶ 2, 114 P.2d 804 (1941).

The estate relies on *In re Estate of Gustason,* 173 Kan. 619, 250 P.2d 837 (1952). There, the parties entered into a full and complete property settlement. In the agreement, the wife forever released her husband from any and all obligations to support her or to provide alimony. Less than one year later, the husband died intestate leaving no children. His widow claimed her portion of his estate and we found the property settlement operated as a full and complete division of the parties' property and barred the wife from inheriting her husband's estate under the laws of intestate succession. We recognize the foregoing cases were decided long before the enactment of K.S.A. 1980 Supp. 60-1610(*e*). The *Gustason* case is also not directly on point here because although the opinion recites the couple experienced marital difficulties, it is not clear whether the separation agreement in that case was entered into in contemplation of divorce.

Since it is clear a separation agreement is valid when entered into in contemplation of divorce although divorce does not occur, we must determine whether K.S.A. 1980 Supp. 60-1610(*e*) mandates trial court approval in this case when the divorce was filed but not completed. The record discloses each party took possession of the property as assigned in the agreement and Owen Loughmiller paid Peggy's hospitalization insurance premium pursuant to the terms of the agreement until his death. After that time, his estate paid the next two months of premiums.

We hold under the circumstances of this case, where the contract was executed and the intent of the parties was carried out, the trial court's approval of the agreement was unnecessary to establish its validity.

As an afterthought, appellee questions whether the agreement was knowingly and voluntarily entered into. The facts disclose that at Peggy's suggestion, the couple went to an attorney named Jones on January 23, 1979, to discuss the need for a separation agreement. A rough draft of the agreement was prepared and a

copy was delivered to Peggy on January 24, 1979. She attempted to seek advice from another attorney, Jack Goodrich, and took the agreement to his office that afternoon and the next morning but Goodrich was out of his office both times. Mrs. Loughmiller returned to Jones' office and signed the instrument the afternoon of January 25, 1979. She now complains she did not read the agreement but merely trusted her husband and Mr. Jones. She contends the agreement was not intended to dispose of their estates.

We held in *In re Estate of Broadie,* 208 Kan. 621, 627-628, 493 P.2d 289 (1972):

"Outright fraud or misrepresentation must be made to appear clearly before a contract voluntarily entered into may be declared invalid. . . .

"Absent outright fraud or intentional misrepresentation two persons may enter into a valid and binding antenuptial contract without any independent advice if the contract is fairly and understandingly made and if it is just and adequate in its provisions."

We apply the same principles to the post-nuptial agreement in this case. Here, the facts and circumstances do not raise a presumption of fraud or misrepresentation. The impetus for an agreement came from Peggy Loughmiller. She participated in the discussions about the agreement with attorney Jones and had a copy of the agreement for a full day to study before executing it. Peggy Loughmiller is an experienced businesswoman capable of understanding a written agreement. She retained all her previously acquired property and Mr. Loughmiller retained all his previously acquired property. Under the facts of this case, independent advice was unnecessary for Peggy Loughmiller. We conclude the separation agreement between Owen Loughmiller and Peggy Loughmiller dated January 25, 1979, was fairly, knowingly and willingly made and was just and equitable.

The judgment of the trial court is affirmed in part and reversed in part.