#25065-rev & rem-JKM

**2010 SD 2**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

THE ESTATE OF PAUL A.
DUVAL, Deceased.

KAREN HARGRAVE,                                        Petitioner and Appellee,

      v.

NATHALIE DUVAL-COUETIL and
ORIELLE DUVAL-GEORGIADES,               Respondents and Appellants.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE SEVENTH JUDICIAL CIRCUIT
CUSTER COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE JEFF W. DAVIS
Judge

\* \* \* \*

PATRICK M. GINSBACH
JAMES G. SWORD of
Farrell, Farrell and Ginsbach, PC                 Attorneys for petitioner
Hot Springs, South Dakota                           and appellee.

GERALD M. BALDWIN                                 Attorney for respondents
Custer, South Dakota                                   and appellants.

\* \* \* \*

ARGUED ON OCTOBER 7, 2009

OPINION FILED **01/06/10**

#25065

MEIERHENRY, Justice

[¶1.]    Nathalie Duval-Couetil and Orielle Duval-Georgiades (Daughters) appeal the circuit court's judgment that Karen Hargrave (Hargrave) was the common-law wife of their father, Paul A. Duval (Duval). Daughters contend the circuit court erred when it held that Duval and Hargrave entered into a common-law marriage under the laws of Mexico and Oklahoma. We agree and reverse the circuit court.

## FACTS AND BACKGROUND

[¶2.]    Duval and Hargrave began living together in Massachusetts in 1994. In 1995, Duval acquired a home in Custer, South Dakota. Hargrave moved from Massachusetts to Duval's home in South Dakota in 1996. In 1997, Duval and Hargrave began a yearly routine of spending the summer months in Custer and the winter months in Mexico. In 1998, Duval and Hargrave bought a home together in Nuevo Leon, Mexico, as husband and wife.

[¶3.]    In 2005, Duval was assaulted while in Mexico and placed in an intensive care unit for his injuries. Hargrave lived with Duval at the hospital while he was being treated. She later took Duval to Oklahoma for rehabilitation at a hospital in the Tulsa area and eventually to Rochester, Minnesota, for medical treatment at Mayo Clinic. Duval and Hargrave subsequently returned to Oklahoma for a period of time; and then, resumed their annual routine of spending winters in Mexico and summers in Custer. Duval was killed as a result of a rock climbing accident on June 24, 2008, in Custer County, South Dakota.

[¶4.]      Duval and Hargrave never formally married. Hargrave testified that she and Duval had discussed a formal wedding ceremony, but mutually decided against it. She said they did not think they needed to marry because they held themselves out as husband and wife and felt like they were married. The circuit court specifically found that over the course of Duval and Hargrave's relationship, Duval referred to Hargrave as his wife on an income tax return form, designated her as the beneficiary on his VA health benefits application, and executed a general power of attorney in her favor.

[¶5.]      The circuit court ultimately concluded that Hargrave had established that she and Duval met the requirements for a common-law marriage under the laws of both Mexico and Oklahoma. As such, Hargrave was treated as Duval's surviving spouse for inheritance purposes in South Dakota. Daughters appeal. Daughters' main issue on appeal is whether the circuit court erroneously recognized Hargrave as Duval's surviving spouse entitling her to inherit from his estate. They claim (1) that the South Dakota domicile of Duval and Hargrave precluded them from entering into a common-law marriage in either Mexico or Oklahoma, (2) that South Dakota law does not recognize a Mexican concubinage as a marriage, and (3) that Hargrave and Duval had not entered into a common-law marriage under Oklahoma law.

## ANALYSIS

[¶6.]      The relevant facts are not in dispute. Because the issues involve questions of law, our review is de novo. Sanford v. Sanford, 2005 SD 34, ¶12, 694 NW2d 283, 287. The first issue centers on whether South Dakota will give effect to

a common-law marriage established by South Dakota domiciliaries while living in a jurisdiction that recognizes common-law marriage.

*Common-Law Marriage*

[¶7.]     Common-law marriages were statutorily abrogated in South Dakota in 1959 by an amendment to SDCL 25-1-29. Notwithstanding, Hargrave contends that South Dakota continues to recognize valid common-law marriages entered into in other jurisdictions. Hargrave relies on SDCL 19-8-1, which provides that "[e]very court of this state shall take judicial notice of the common law and statutes of every state, territory, and other jurisdiction of the United States." *Id.* In addition to taking judicial notice of the common-law of other states, the South Dakota Legislature specifically addressed the validity of marriages entered into in other jurisdictions in SDCL 25-1-38. This statute provides that "[a]ny marriage contracted outside the jurisdiction of this state . . . which is valid by the laws of the jurisdiction in which such marriage was contracted, is valid in this state." *Id.* In view of these statutes, we conclude that a common-law marriage validly entered into in another jurisdiction will be recognized in South Dakota.*

[¶8.]     Daughters argue that the domicile of the couple controls their ability to enter into a common-law marriage. Daughters urge this Court to adopt a rule requiring parties to a common-law marriage to be domiciled in the state in which

---

*     Notably, "a common law marriage contracted in a state of the United States that recognizes common law marriages is just as valid as a ceremonial marriage . . . [and] is not a second-class sort of marriage[.]" Rosales v. Battle, 7 CalAppRptr3d 13, 17, 113 CalApp4th 1178, 1184 (2003) (citations and quotations omitted).

the marriage occurred. Thus, a couple domiciled in South Dakota could not be considered married merely by traveling to another state that recognizes common-law marriage and meeting that state's common-law marriage requirements. Daughters further allege that at all relevant times, Duval and Hargrave were domiciled in South Dakota, thereby precluding them from entering into a common-law marriage in either Mexico or Oklahoma. Daughters cite *Garcia v. Garcia* as authority for the domicile requirement. 25 SD 645, 127 NW 586 (1910). In *Garcia,* we said that a marriage "valid in the state where it was contracted, is to be regarded as valid in [South Dakota]." *Id.* at 589. We do not interpret *Garcia* as requiring domicile in the state in which the marriage occurred.

[¶9.]         This is consistent with other jurisdictions that do not require parties to establish domicile in the state where the common-law marriage occurred. Minnesota courts have recognized common-law marriages entered into in other jurisdictions. In *Pesina v. Anderson*, the court held it would "recognize a common-law marriage if the couple takes up residence (but not necessarily domicile) in another state that allows common-law marriages." 1995 WL 387752 *2 (MinnCtApp 1995) (quoting Laikola v. Eng'r Concrete, 277 NW2d 653, 658 (Minn 1979)) (citations omitted). Similarly, in *Vandever v. Indus. Comm'n of Ariz.*, the court stated that it "disagree[d] with the legal reasoning of cases which hold that the policy of the domicile disfavoring common-law marriages should govern unless the couple has subsequently established residence in a state recognizing such marriages." 714 P2d 866, 870 (Ariz 1985). The *Vandever* court went on to state, "[t]hese cases effectively read a requirement of residency into the law of all

common-law marriage[] states which may or may not exist." *Id.* *See* Grant v. Superior Court in and for County of Pima, 555 P2d 895, 897 (ArizCtApp 1976) ("Although Arizona does not authorize common law marriage, it will accord to such a marriage entered into in another state the same legal significances as if the marriage were effectively contracted in Arizona."). Mississippi has also recognized that "[t]he [domicile requirement] argument ignores the basic right of all persons to choose their place of marriage. As long as they follow the requirements of the law of the state of celebration, the marriage is valid in most jurisdictions." George v. George, 389 So2d 1389, 1390 (Miss 1980). Likewise, Maryland "has continuously held that a common-law marriage, valid where contracted, is recognized in [Maryland]." Goldin v. Goldin, 426 A2d 410, 412 (MdCtSpecApp 1981).

[¶10.]      In addition to *Garcia,* the plain meaning of SDCL 25-1-38 does not require domicile in the foreign jurisdiction in order for the marriage to be considered valid in South Dakota. Consequently, we hold that South Dakota does not require domicile in the foreign jurisdiction before recognizing that jurisdiction's common-law marriage scheme. All that is necessary for a marriage from another jurisdiction to be recognized in South Dakota is for the marriage to be valid under the law of that jurisdiction. *See* SDCL 25-1-38. Thus, the question in this case is whether Duval and Hargrave would be considered validly married under the laws of either Nuevo Leon, Mexico, or Oklahoma.

*Concubinage in Mexico*

[¶11.]      The parties agree that Nuevo Leon, Mexico, has no common-law on which a common-law marriage could be established. *See In the Common Law of*

*Mexican Law in Texas Courts*, 26 Hous J Int'l L 119, 151-56 (2003) (citing Nevarez

v. Bailon, 287 SW2d 521, 523 (TexCivApp 1956)).  Nuevo Leon does, however, have

a law that gives certain rights to persons who have entered into a concubinage.

Hargrave provided the state law of Nuevo Leon, which defines a concubinage as:

> [T]he union of a man and woman, free from formal matrimony,
> who for more than five years make a marital life without being
> united in a formal matrimony unto the other as long as there is
> no legal impediment to their contracting it.  The concubine's
> gender union can have rights and obligations in reciprocal form,
> of support and inheritance, independently of all others
> recognized by this code or other laws.

Compilacion Legislativa del Estado de Nuevo Leon, p 50, Book I of Persons, Title V

of Matrimony, Ch 11 of Concubinage, Art 291.  The circuit court concluded that

concubinages were to be given the same legal effect as common-law marriages

validly entered into in the United States.  Daughters argue, however, that a

concubinage is not the legal equivalent of a common-law marriage.

[¶12.]        Other courts that have addressed this issue have declined to equate a

concubinage with a common-law marriage.  In *Nevarez*, the court held a woman who

cohabited with a man within the definition of a concubinage was not entitled to

claim any of the man's property after his death as his common-law wife because

common-law marriage was not recognized in that Mexican state.  287 SW2d at 523.

The court noted that under Mexican law a concubinage was a "'legal union' but not

a legal marriage." *Id.*  Because the woman met the definition of a concubine, she

was entitled to certain rights, but was not a common-law wife under the laws of

Mexico.  *Id.*  Consequently, she was not entitled to the benefits given to a common-

law wife in Texas "for such a relationship [was] non-existent in [Mexico]," and she would not "qualify in her home jurisdiction as a surviving wife." *Id.* at 525.

[¶13.]     A California court similarly addressed the issue of whether "concubinage is equivalent to a Mexican common law marriage[.]" *Rosales*, 113 CalApp at 1183. In *Rosales*, a Mexican citizen claimed she was the surviving spouse, for purposes of a wrongful death claim, of a deceased American who was the father of her children. *Id.* The *Rosales* court, citing *Nevarez*, determined "that although concubinage is a legal relationship in Mexico, it is not a legal marriage." *Id.* at 1184. The *Rosales* court affirmed the trial court on this basis recognizing that "concubinage is not equivalent to a common law marriage because it does not confer on the parties all of the rights and duties of marriage." *Id.*

[¶14.]     We are persuaded by the reasoning of *Nevarez* and *Rosales* and also conclude that a Mexican concubinage is not the legal equivalent of a common-law marriage in the United States. Consequently, the circuit court erred in concluding the concubinage between Duval and Hargrave, if one existed, had the same legal effect as a common-law marriage. Therefore, we reverse on this issue.

*Common-Law Marriage in Oklahoma*

[¶15.]     The circuit court concluded that Duval and Hargrave entered into a valid common-law marriage while they lived in Oklahoma. The Oklahoma Court of Civil Appeals recently reaffirmed its recognition of common-law marriages and its requirements. The court stated:

> [T]his Court recognizes in accordance with established
> Oklahoma case law that, absent a marital impediment suffered
> by one of the parties to the common-law marriage, a common-
> law marriage occurs upon the happening of three events:  a

> declaration by the parties of an intent to marry, cohabitation, and a holding out of themselves to the community of being husband and wife.

*Brooks v. Sanders*, 190 P3d 357, 362 (OklaCivApp 2008). In *Brooks,* the court referenced an earlier Oklahoma case that explained the requirements of Oklahoma's common-law marriage as follows:

> 'To constitute a valid 'common-law marriage,' it is necessary that there should be an actual and mutual agreement to enter into a matrimonial relation, permanent and exclusive of all others, between parties capable in law of making such contract, consummated by their cohabitation as man and wife, or their mutual assumption openly of marital duties and obligations. A mere promise of future marriage, followed by illicit relations, is not, in itself, sufficient to constitute such marriage.'

*Id.* at 358 n2 (quoting D.P. Greenwood Trucking Co. v. State Indus. Comm'n, 1954 OK 165, 271 P2d 339, 342 (quoting Cavanaugh v. Cavanaugh, 1929 OK 101, 275 P 315)). Based on the language of these two cases, it appears that Oklahoma requires (1) a mutual agreement or declaration of intent to marry, (2) consummation by cohabitation, and (3) publicly holding themselves out as husband and wife. Oklahoma law requires the party alleging a common-law marriage satisfy these elements by clear and convincing evidence. Standefer v. Standefer, 2001 OK 37, ¶11, 26 P3d 104, 107 (citing Maxfield v. Maxfield, 1953 OK 390, ¶24, 258 P2d 915, 921).

[¶16.] Thus, the first requirement Hargrave had to satisfy by clear and convincing evidence was that she and Duval had mutually agreed and/or declared their intent to marry while in Oklahoma. *Brooks*, 190 P3d at 362. "Some evidence of consent to enter into a common-law marriage are cohabitation, actions consistent with the relationship of spouses, recognition by the community of the marital

relationship, and declarations of the parties." *Standefer*, 2001 OK 37, ¶11, 26 P3d at 107 (citing Reaves v. Reaves, 1905 OK 32, 82 P 490). The circuit court made no finding on mutual agreement or declaration of intent to marry, yet concluded that Duval and Hargrave entered into a common-law marriage. We have said a circuit court "is not required to 'enter a finding of fact on every fact represented, but only those findings of fact essential to support its conclusions.'" *In re* S.K., 1999 SD 7, ¶8, 587 NW2d 740, 742 (quoting Hanks v. Hanks, 334 NW2d 856, 858-59 (SD 1983)). A finding on whether the couple mutually agreed or declared their intent to marry while in Oklahoma was essential to support the circuit court's conclusion that they entered into a common-law marriage. A review of the testimony may explain why the circuit court was unable to enter a finding of a mutual agreement or declaration of intent to enter into a marital relationship.

[¶17.] Hargrave testified that she and Duval entered into an "implicit agreement" to be married while they were in Oklahoma. She also testified that "nobody said, okay, so we should agree to be married and write it down and put the date on it." When asked on cross-examination if there was ever a point when she and Duval made an agreement to be married, Hargrave stated in the negative, and said the couple just decided "well, I guess we are [married]."

[¶18.] The Oklahoma Supreme Court addressed this issue under a similar situation and recognized the importance of establishing a clear intent to marry. *Standefer*, 2001 OK 37, ¶11, 26 P3d at 107-08. In *Standefer*, the court stated the "evidence [wa]s clear and convincing that both parties assented to a marriage on Thanksgiving Day of 1988." Both the husband and wife in *Standefer* agreed that

they were common-law spouses as a result of their mutual assent to marry on that day. Significantly, the couple was able to identify an instance where they mutually assented to a marriage. This fact stands in contrast to the present case where Hargrave's testimony established that no specific time existed when the couple mutually agreed or declared their intent to be married. To meet Oklahoma's requirements, their mutual agreement or declaration to marry would have to be more than an implicit agreement. This consent requirement is consistent with SDCL 25-1-38, which sets forth the requirement that a marriage must be "contracted" in the other jurisdiction before South Dakota will recognize the marriage as valid. SDCL 25-1-38 provides "[a]ny marriage *contracted* outside the jurisdiction of this state . . . which is valid by the laws of the jurisdiction in which such marriage was *contracted*, is valid in this state." *Id.* (emphasis added). Failing to establish that mutual assent or a declaration to marry took place, Hargrave could not meet the first requirement for entering into a common-law marriage in Oklahoma as outlined by *Brooks*. 190 P3d at 362.

[¶19.] The absence of a finding of fact on this issue, coupled with Hargrave's testimony, leads to a conclusion that as a matter of law Hargrave could not prove by clear and convincing evidence that the couple entered into a valid common-law marriage while in Oklahoma. Thus, no legal basis existed to support the circuit court's conclusion that the parties entered into a common-law marriage in Oklahoma.

**CONCLUSION**

[¶20.]    Based on the foregoing, we conclude that Duval and Hargrave were not validly married under either Mexico or Oklahoma law.  Consequently, Hargrave cannot be considered a surviving spouse for purposes of inheriting from Duval's estate.

[¶21.]    We reverse and remand to the circuit court for proceedings consistent with this opinion.

[¶22.]    GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and SEVERSON, Justices, concur.